UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    -v-

REYNALDO MARRERO,

            Defendant.

18 Crim. 522 (ER)

**SENTENCING MEMORANDUM OF REYNALDO MARRERO**

Michael Tremonte
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel:  212.202.2600
Fax:  212.202.4156
E-mail:  mtremonte@shertremonte.com

## PRELIMINARY STATEMENT

Reynaldo Marrero is a devoted son, brother, and partner – a person described as kind, caring and helpful to all those around him.  But the last fifteen years of Mr. Marrero's life have been dominated by a struggle with drug addiction.  Sometimes he is in control of the addiction, but often it controls him – particularly his addiction to opioids.  Like thousands of other Americans who suffer from this debilitating disease, his efforts to manage it define many of his days.  Despite his addiction, Mr. Marrero has maintained close ties with his family, a committed romantic relationship, and has engaged in productive employment (though not always consistently).  He has also tried repeatedly to break his habit by participating in drug rehabilitation programs, and with help, has lately managed to stay largely away from illicit substances.  But he continues to struggle and recognizes that his path out of addiction will be a long and winding one.

In this case, Mr. Marrero pled guilty to possessing heroin for personal use, something he has done on many occasions.  He was on pretrial supervision for nearly two years, during which he attended several different treatment programs, both in-patient and out-patient, with mixed success.  Besides lapses in sobriety, however, he has otherwise steered clear of trouble since the arrest that ultimately led to this federal case.  Although his pretrial supervision was terminated in February of this year, he has continued to engage in treatment and has managed to stay away from heroin (with the help of maintenance drugs) for what is now a sustained period of time.  He plans to continue to seek treatment after this matter is resolved.

Mr. Marrero submits this memorandum, by and through his undersigned counsel, in anticipation of his misdemeanor sentencing, currently scheduled for May 8, 2020.  Pursuant to the CARES Act of 2020 and the Southern District's Standing Order in *In Re: Coronavirus/COVID-19 Pandemic*, 20MC176 (S.D.N.Y. Mar. 30, 2020) (McMahon, C.J.), ECF

No. 1, this Court is authorized to conduct sentencing remotely via video or tele-conference with the defendant's consent. Mr. Marrero consents to remote sentencing. For the reasons discussed below, on the unique facts of this case, we respectfully submit that a sentence of time served with no supervision to follow is sufficient but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

### I.     Relevant Life History[1]

Mr. Marrero was born on October 2, 1980 in the Bronx. His family was poor and Mr. Marrero's father was an inconstant presence in the household. Mr. Marrero recalls his relationship with his father diminishing over time, and vividly remembers seeing his father from a distance panhandling on Fordham Road in the Bronx as an adolescent. PSR ¶ 53. Mr. Marrero's mother, Elba Fournier, reports that his biological father also was addicted to drugs. *Id.* ¶ 58. Ms. Fouriner struggled to provide for five children working as a store clerk without support from her husband. When Mr. Marrero was six or seven years old, Ms. Fournier met Israel Ortiz, who became a father figure to Mr. Marrero. Tragically, however, Mr. Ortiz was killed during a robbery in the store where he worked when Mr. Marrero was under ten years old. *Id.* ¶ 56. Ms. Fournier reports this had a devastating impact on young Mr. Marrero. Later, in Mr. Marrero's adolescent years, however, Ms. Fournier met Carlos Garcia, another boyfriend who became a step-father to Mr. Marrero and whose real estate business provided a measure of financial security to the family. *Id.* ¶ 55. Ms. Fournier began working for the real estate

---

[1]     The following is drawn from the PSR, counsel's interviews with Mr. Marrero, and discussions with and letters from his family members and friends. Letters from family members are attached hereto as **Exhibit A**.

business and their fortunes improved. *Id.* Mr. Marrero maintains a close relationship with Mr. Garcia to this day.

Unfortunately, the impact of Mr. Marrero's turbulent childhood began to manifest when he reached high school. He started smoking marijuana at age eleven or twelve, and drinking regularly with friends from age 15. *Id.* ¶ 68. He had his first run-in with law enforcement at age 16. He was diagnosed at the time by a psychologist at a juvenile detention facility as having dysthymia, a persistent mild depression. *Id.* ¶ 67. Mr. Marrero has continued to suffer from depression, as well as anxiety, for which he has been prescribed medication in recent years. *Id.* ¶ 66. His consumption of marijuana and alcohol, and his subsequent more serious drug habit, originated as a means of self-medication.

After several arrests for petty crimes as a youth and young adult, Mr. Marrero moved to Miami, Florida, with his girlfriend. *Id.* ¶ 59. In 2001, Mr. Marrero fathered a daughter, who is now 18 years old and with whom he maintains a close and caring relationship. *Id.* While in Florida, Mr. Marrero worked installing cubicles in offices and as a warehouse worker for a cigar distribution company. *Id.* ¶¶ 82-85. However, in 2002, Mr. Marrero sustained an injury at work when a pallet fell on him. *Id.* ¶ 63. Mr. Marrero was treated and released the same day at the emergency room and given medication for pain. *Id.* He continued to experience back pain persistently after this incident (and still does periodically to this day). *Id.* While by no means entirely responsible, this injury and Mr. Marrero's exposure to opiates for pain management contributed to his experimenting – and quickly becoming addicted to – heroin and Percocet a couple of years later.

In 2004, Mr. Marrero moved back to the Bronx. Shortly thereafter, he first tried heroin, which he initially used infrequently, but after about a month began using daily. *Id.* ¶ 68. He also began using other drugs, including Percocet and Xanax. *Id.* In 2006, realizing that his drug

habit was taking over his life, Mr. Marrero enrolled in a 90-day inpatient rehabilitation program at Phoenix House in Long Island City, New York. *See id.* ¶ 69. He completed the program, but subsequently was unable to avoid the pull of addiction. *Id.* Thus began a cycle that sadly continues to bedevil Mr. Marrero to this day: He continued to use heroin and other substances – on a daily basis for substantial periods of time – at times enrolling himself in treatment, which he sometimes completed and sometimes did not. Notably, Mr. Marrero's most sustained track record of treatment has occurred following his arrest in this case. He enrolled in a detoxification program just after he was arrested – but before the initiation of the federal case and before drug treatment was mandated by the terms of his pretrial release. *Id.* He has also continued to participate in out-patient treatment even after the termination of his pretrial supervision. Although Mr. Marrero has had lapses over the last two years – and used heroin as recently as late 2019 – the period since his arrest has marked the longest period since he was in his mid-twenties that he has spent mostly on maintenance drugs, such as methadone and suboxone, rather than using heroin itself.[2]

In addition, although addiction has had a defining role in Mr. Marrero's life, those who know him well attest that his true nature is not defined by his addiction and recent criminal convictions for sales to support his habit. Mr. Marrero is a loving boyfriend to his girlfriend Ashley LaVallee, who attended his plea and has continued to support him throughout this case. Although his daughter grew up in Miami with her mother, Mr. Marrero has maintained a close relationship with her and a friendly relationship with her mother. Finally, Mr. Marrero is a

---

[2] The Presentence Report appears to question whether Mr. Marrero was in a methadone treatment program in February 2020, stating that Pretrial Services was unaware of his participation in any such program. *See* PSR ¶ 4. This is somewhat perplexing because the Court ordered Mr. Marrero to participate in the Promesa program, which is an out-patient methadone treatment program. Mr. Marrero successfully completed detoxification at Promesa, as ordered by the Court, and continued to attend out-patient treatment until the outbreak of the COVID-19 epidemic.

caring and loving son and brother.  His mother, Ms. Fournier, writes "He has struggled continuously with the demon that drug addition is but throughout it all he has remained the kindest, compassionate human being I have ever known."  Ex. A (Letter of Elba Fournier).  She cites his work ethic and his positive presence in the community, recognizing, however, that he very much needs to start "a new path."  *Id.*  Mr. Marrero's sister, Josephine Vicente, writes that he is "a kind, loving, helpful individual" who has "proven to be hardworking when given the opportunity."  *Id.* (Letter of Josephine Vicente).  Like many families of people who struggle with addiction, Mr. Marrero's family has had to weather many storms caused by his inability to control his cravings.  Yet, they stand by him.  As Ms. Vicente says, "I wholeheartedly believe in him."  *Id.*  His brother Ricardo Marrero notes that he has seen Mr. Marrero "struggle, break down and cry because this battle within him has really shook him to to the core," yet he continues to be a kindhearted, caring, compassionate individual."  *Id.* (Letter of Ricardo Marrero). His half-sister Amber Garcia describes how, despite Mr. Marrero's own failings, he never stopped encouraging her to remain in college while working two jobs.  *Id.* (Letter of Amber Garcia).  In sum, Mr. Marrero is a flawed but fundamentally kind and caring person, who suffers from a debilitating disease that plagues countless Americans.

## II.    Offense Conduct

The offense conduct in this case, while no doubt serious, reflects the nuances and many of the positive qualities of Mr. Marrero.  As an initial matter, the crime of conviction is simple possession of heroin, in violation of 21 U.S.C. § 844, a misdemeanor and the lowest level drug offense in the federal system.  Though a symptom of his disease, Mr. Marrero accepts full responsibility for his conduct.

Because the Court may consider relevant conduct beyond the crime of conviction, to the extent it considers evidence related to the gun possession charge on which Mr. Marrero was

originally indicted, it should consider the totality of the circumstances related to that conduct.
On April 27, 2018, Mr. Marrero received a call from an individual he knew as "Soto" whom he'd
met in a drug program. Soto told him he was on his way to the building where Mr. Marrero was
staying, 175 Alexander Avenue, to commit an armed robbery. Mr. Marrero told Soto he would
meet him downstairs in the lobby. He went downstairs with the intention of intercepting Soto to
try to prevent the robbery. As is evident on the surveillance video from the building,
Mr. Marrero met Soto in the lobby and the two engaged in a heated discussion. Mr. Marrero
convinced Soto to give him the gun and told him he would wait in a hallway in the back of the
lobby. The plan, as Mr. Marrero told him, was that Soto would accost the intended victim in the
front of the building, and Mr. Marrero would then come from behind with the gun to rob that
individual. However, Mr. Marrero did not wait in the hallway. As can be seen on the video, he
exited the building from the rear and ran around the side of the building to see whether Soto was
standing in front. His real plan was to re-enter the building from the rear and go back up to his
apartment, so that Soto would be disarmed and the robbery could not be completed.

Unbeknownst to Mr. Marrero, however, the robbery was itself a set-up. Soto was
working as a confidential informant for the NYPD. He had been arrested the day before with a
gravity knife, which he tried to conceal from the police, and had agreed to assist the officers who
arrested him (who were not his handlers and did not clear their operation with his handlers) in
making an arrest for gun possession. Thus, after he had handed off the firearm to Mr. Marrero,
Soto signaled to the officers to go to the back of the building to arrest him. The officers, wearing
plainclothes, confronted Mr. Marrero has he tried to re-enter the building and tried to grab him.
He instinctively ran and dropped the gun as they were chasing him. He also threw a small
amount of heroin he was carrying. The officers caught up to Mr. Marrero and arrested him.

That same day, at the police precinct, Mr. Marrero gave a voluntary statement that was precisely consistent with the foregoing.  Mr. Marrero maintained that he had obtained the gun from Soto in an effort to thwart what he believed was a planned robbery in his building and told a consistent narrative about their interaction even before he had seen the video surveillance which corroborated the details of that narrative.  Thus, although Mr. Marrero did temporarily possess a gun, as will be discussed below, that possession was more consistent with fleeting or innocent possession (or, at a minimum, entrapment) than a planned course of criminal conduct.

### III.    Procedural History

As noted, Mr. Marrero's arrest occurred on April 27, 2018.  On June 20, 2018, Mr. Marrero was charged federally with unlawful possession of a weapon by a prior felon in violation of 18 U.S.C. § 922(g).  He was released later that day and returned to the in-patient drug treatment program in which he had previously enrolled himself.

On November 1, 2018, Mr. Marrero filed a motion to suppress evidence and for a *Franks* hearing.  On February 1, 2019, the Court held a hearing regarding Mr. Marrero's motion to suppress.  At that hearing, the three officers who participated in the arrest of Mr. Marrero testified about arresting the confidential informant the day before and agreeing to use him in a proactive operation (which they did not clear with the informant's handlers or the chain of command) the following day.  *See* Suppression Hr'g Tr. 80-81.  The officers received a call from the informant the next day telling them that he had located an individual who had a gun.  *Id.* at 84-85.  The officers conceded on cross-examination that they had done nothing to vet the informant's information and did not know whether the target of their operation – who turned out to be Mr. Marrero – or the informant himself brought the gun to the location.  *Id.* at 128 ("Q:

You don't know whether or not the CI put the gun in Mr. Marrero's hands as you sit here today, correct?  A:  That's correct.").[3]

Mr. Marrero tested positive for opiates on numerous occasions during his pretrial release (most of those occasions were positive tests for methadone and/or suboxone) and entered several drug treatment programs.  He failed to complete two of those programs because one would not allow him to use methadone or suboxone for maintenance, and at another he ran into the individual identified above as Soto and Mr. Marrero felt it could be problematic for him to associate with this individual who might ultimately be a witness for the government in his case. On September 18, 2019, Pretrial Services submitted a violation memorandum to the Court and Mr. Marrero was ordered to enter drug treatment at Promesa in the Bronx.  He successfully completed in-patient detoxification treatment there and then shifted to out-patient treatment.

On February 3, 2020, Mr. Marrero pled guilty to a superseding information charging him with one count of simple possession of narcotics in violation of 21 U.S.C. § 844.  At the change of plea hearing, Mr. Marrero admitted that he possessed heroin for personal use on April 27, 2018, and that he knew it was wrong to do so.  *See* Tr. of Plea Hr'g, *United States v. Marrero*, 18 Cr. 522 (ER) (S.D.N.Y. Feb. 3, 2020), ECF No. 50.

Mr. Marrero's pretrial supervision was terminated, at the recommendation of Pretrial Services, on March 3, 2020.  Nevertheless, he continued to attend Promesa until no longer feasible due to the COVID-19 pandemic.

---

[3]     In January 2020, two of the three officers who testified at the suppression hearing were found to have given incredible testimony in a hearing before Judge Kaplan in *United States v. Demetreus Bell*, 19 CR 717 (S.D.N.Y.).  *See* Dkt. # 46.  At the time of Mr. Marrero's plea in this matter, his motion to suppress was *sub judice*.

IV.     **PSR and Guidelines Calculation**

A.     **PSR**

The Presentence Report ("PSR") calculated Mr. Marrero's Sentencing Guidelines in accordance with the parties' stipulated calculation, set forth below.  *See* PSR ¶¶ 15-23.  The Probation Department recommended a sentence of time served with one year of supervised release.  *See id.* at 24.

Mr. Marrero maintains the following objections to the PSR:

- At paragraph 49, the Probation Department declined to include information about the individual identified by Mr. Marrero as "Soto" being a confidential informant, stating that such information could not be verified.  But in the suppression hearing, the officers identified that individual on the video and the confidential informant who led them to Mr. Marrero, and conceded they did not search that individual prior to his encounter with Mr. Marrero.  *See* Suppression Hr'g Tr. at 27-28.

- We maintain our objection to Paragraph 92 (previously 89) which states the Sentencing Guidelines range for a hypothetical conviction that did not occur.

- We object to the special condition "requiring the defendant to submit his person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States probation officer is warranted since he has an extensive history of possessing illicit drugs."  It is not clear what rational basis could be advanced for requiring Mr. Marrero to submit electronic data or media devices to a probation officer.

B.     **Guidelines Calculation**

Pursuant to the plea agreement, the parties stipulated that, under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"),[4] the Guidelines provision applicable to

---

[4]     The parties stipulated that November 1, 2018 version of the United States Sentencing Guidelines Manual applies to this case.

offense charged in Count One is U.S.S.G. § 2D2.1.  The parties further stipulated that the

following Guidelines provisions apply:

- Pursuant to U.S.S.G. § 2D1.1(a)(1), the base offense level is 8 because the substance involved is heroin.

- Pursuant to U.S.S.G. § 3E1.1(a), because Mr. Marrero demonstrated acceptance of responsibility by pleading guilty, the offense level is decreased by 2 levels.

Accordingly, the total offense level is 6.  Mr. Marrero and the government also stipulated

that Mr. Marrero has four criminal history points and that, consequently, his Criminal History

Category is III.  Accordingly, Mr. Marrero's Sentencing Guidelines range is 2 to 8 months.

## ARGUMENT

### I.    Legal Standard

District courts have an "overarching duty 'to impose a sentence sufficient, but not greater

than necessary,' to serve the purposes of sentencing."  *Pepper v. United States*, 562 U.S. 476,

492 (2011) (quoting 18 U.S.C. § 3553(a)).  These purposes, set forth in 18 U.S.C. § 3553(a)(2),

are:

> [T]he need for the sentence imposed . . . to reflect the seriousness of the offense, to
> promote respect for the law, and to provide just punishment, . . . to afford adequate
> deterrence to criminal conduct; . . . to protect the public from further crimes of the
> defendant; and . . . to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (2012).  Though a sentencing court must consider the "kinds of sentence

and sentencing range established for . . . the applicable category of offense committed by the

applicable category of defendant as set forth in the [U.S.S.G.]," *id.* § 3553(a)(4), "calculating the

correct Guideline range [is] 'just an initial step in the sentencing process,'" *United States v. Al

Halabi*, 563 F. App'x 55, 57 (2d Cir. 2014) (summary order) (citation omitted).  A "district court

may not presume that a [G]uidelines sentence is reasonable."  *Id.* (quoting *United States v.

Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)).   Rather, the court must "make an

individualized assessment based on the facts presented." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 41, 50 (2005)).

Thus, in addition to the Guidelines, courts are also required to consider a variety of other factors set forth in § 3553(a), including the "nature and circumstances of the offense" and the "history and personal characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  Indeed, the United States Supreme Court has "emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'"  *Pepper*, 562 U.S. at 487-88 (citations omitted) (alterations in original).  "In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment," the Second Circuit has held, "a sentencing judge must have a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'"  *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (quoting Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993)) (internal citation omitted).

## II.    The § 3553(a) Factors Support a Below-Guidelines Sentence of Time Served

Here, consistent with the Probation Department's recommendation, the factors set forth in § 3553(a) warrant a sentence of time served.

As to the seriousness of the offense and the need to promote respect for the law and provide just punishment, while Mr. Marrero certainly knows all too well the dangers of drug possession and use, his conviction is for simple possession, an offense on the lowest end of the broad spectrum of federal crimes.  Section 844(a) of Title 21 reflects the congressional intent to treat drug users as categorically different and less culpable than traffickers.[5]  It limits simple

---

[5]    While Mr. Marrero has two previous state convictions for drug sales, both involved small amounts (in one case Xanax and the other heroin) sold to undercover officers.  *See* PSR ¶¶ 40-43.  These were both sales Mr. Marrero engaged in to support his own habit.

possession to a misdemeanor offense, which are relatively rare among the many criminal

prohibitions in the federal code.  While we cannot provide an exhaustive list of sentences in

misdemeanor cases, we have found the following sentencing outcomes indicating that sentencing

courts in this district typically impose no prison time for defendants convicted of

misdemeanors:  *United States v. Jabbi*, 17-Mj-8326 (JCM) (S.D.N.Y.) (imposing sentence of ten

months' probation); *United States v. Sazonov*, 17-CR-657 (S.D.N.Y.); *United States v. Han*, 17-

Cr-49 (KMW) (S.D.N.Y.) (time served, day of arrest, one year supervised release); *United States

v. Tucker*, 17-Cr-682 (HBP) (S.D.N.Y.) (two years' probation); *United States v. Jackson

(Caballero)*, 16-Cr-750 (JSR) (S.D.N.Y.) (one year probation); *United States v. Jager*, 16-Cr-665

(BCM) (S.D.N.Y.) (one year probation and community service); *United States v. Conaway*, 16-

Cr-422 (AJP) (S.D.N.Y.) (five years' probation and community service); *United States v. Parish

(Cummings)*, 16-Cr-212 (LAK) (S.D.N.Y.) (time served and one year supervised release); *United

States v. Pilla*, 15-Cr-783 (RLE) (S.D.N.Y.) (time served and one year supervised

release); *United States v. Rubin (Rivky Rubin)*, 14-Cr-741 (KMK) (S.D.N.Y.) (time served, the

day of the defendant's arrest); US v. Michael Peterkin, 14CR736 (LGS) (S.D.N.Y.) (one year

probation); *United States v. Acosta*, 12-Cr-751 (JFK) (S.D.N.Y.) (three years' probation with

early termination); *United States v. Kiamanesh*, 99-Cr-418 (KNF) (S.D.N.Y.) (fifteen months'

probation).

    As to specific and general deterrence, the Court must take into account that

Mr. Marrero's conduct in this case, as well as his prior criminal convictions were "influenced by

or the result of his addiction to drugs."  *United States v. Hodges*, No. 07-CR-706, 2009 WL

366231, at *8 (E.D.N.Y. Feb. 12, 2009); *see also United States v. Brooks*, 889 F.3d 95, 103 (2d

Cir. 2018) (acknowledging "the difficulty faced by so many offenders in controlling addiction");

*United States v. Trotter*, 321 F. Supp. 3d 337, 339 (E.D.N.Y. 2018) (noting that marijuana use

"is an almost unbreakable addiction or habit for some"); Rollin Gallagher, *Opioids in Chronic Pain Management: Navigating the Clinical and Regulatory Challenges*, 53 J. Fam. Prac. 23 (2004) (stating addiction is characterized by "compulsive use of a drug, impaired control over drug use, craving, and continued use of a drug despite harm to self or others").  "*Treatment* for his drug addiction, rather than further incarceration, will best reduce [Mr. Marrero's] risk of recidivism and provide him with a chance to lead a healthy and productive life."  *United States v. Bath*, No. 18-CR-150, 2019 WL 1459038, at *3 (E.D.N.Y. Mar. 29, 2019) (emphasis added) (sentencing defendant with "serious heroin addiction" who was "heavily addicted" at the time of the underlying conduct to time served); *see also United States v. Douglas*, 713 F.3d 694, 703 (2d Cir. 2013) (stating that district courts may "approach cases of addicted defendants who seek treatment and show promise of changing their lives with compassion and with due consideration of the relative costs and effectiveness of treatment versus long prison sentence"); *United States v. Khan*, No. 14-CR-627, 2015 WL 4605428, at *2 (E.D.N.Y. July 30, 2015) (imposing non-incarceratory sentence because, *inter alia*, defendant "plans to enroll full-time in the fall and is committed to earning a degree, finding a job, and continuing his sobriety, all of which can be more effectively achieved while under supervision, not incarceration").

Indeed, the need to provide Mr. Marrero with treatment is the most compelling consideration for the Court's sentencing determination in this case.  While we submit that further supervision is not warranted, as discussed more fully below, it is clear that any treatment he receives will be most effective in the community rather than in an incarceratory setting. Mr. Marrero has learned from experience that he is most likely to be able to abstain from drug abuse when he takes medications such as methadone used in treating opioid use disorder.  The National Institute on Drug Abuse has noted such medications are "[e]ffective" but "highly underutilized."  National Insitute on Drug Abuse, *Medications to Treat Opioid Disorder*,

https://www.drugabuse.gov/publications/research-reports/medications-to-treat-opioid-addiction/overview (last accessed Apr. 21, 2020).  While the Bureau of Prisons ("BOP") does authorize the use of some of these medications for detoxification, *see* Fed. Bureau of Prisons, *Detoxification of Chemically Dependent Inmates*, https://www.bop.gov/resources/pdfs/detoxification.pdf, such medications are not officially available for long-term maintenance in BOP facilities.  They are, however, often bought and sold illicitly within such facilities, and then taken without medical supervision.  Mr. Marrero is therefore less likely to achieve sobriety in a sustainable way if he is incarcerated.  Better, more effective treatment options are available for him in the community, and he will continue to avail himself of them following the conclusion of this case.

Mr. Marrero's personal history and circumstances also augur strongly in favor of a non-incarceratory sentence.  Though his struggles with addiction have cast a pall over much of his life – and have led to his recent convictions, for drug sales in which he engaged to support his own habit – he has a track record of productive (albeit sporadic) employment.  Further, despite his struggles, he has maintained strong bonds with family, including his mother, siblings, daughter, and his girlfriend.  As the letters of support submitted in connection with this sentencing memorandum indicate, Mr. Marrero's family continues to support him despite recognizing that substance abuse has been a defining characteristic of his life.  His mother, Ms. Fournier, states, "We will stand united as a family to help him start a new path if he is provided with the opportunity to do so."  Ex. A (Letter of Elba Fouriner).  The undersigned counsel have been in regular contact with Mr. Marrero's mother, sister, and girlfriend throughout this representation.  Their constant concern for Mr. Marrero – without any illusions about the difficulty he has in maintaining sobriety – has been impressive and moving.  These close familial ties are the best insurance for keeping Mr. Marrero on the road to recovery.  Severing them by

incarcerating him is likely to be counterproductive.

Finally, the circumstances surrounding Mr. Marrero's arrest further support, rather than undermine, the foregoing factors that counsel in favor of leniency. As Mr. Marrero stated in his post-arrest statement, he is "not a gun guy." He possessed the gun in this case for all of two minutes, and he did so for the purpose of attempting to prevent, rather than exacerbate, a dangerous situation. The Second Circuit has assumed (though not decided) that an "innocent possession" or necessity defense is available to a charge of being a felon in possession of a firearm. *See United States v. Miles*, 748 F.3d 485, 490 (2d Cir. 2014); *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009). While we do not argue that Mr. Marrero would necessarily meet the strict requirements for an instruction on such a defense (for one thing, he likely could not establish that he had "no reasonable legal alternative to violating the law by taking possession of the weapon," *White*, 552 F.3d at 247), these cases recognize that there are degrees of culpability in felon-in-possession cases. Here, where a confidential informant acting at the behest of the government brought a gun to the scene, induced Mr. Marrero – who has no prior history of or any indication of a proclivity toward gun possession – by stating that he intended to commit an armed robbery, and where Mr. Marrero's possession of the gun was both momentary and aimed at thwarting that robbery, the facts of the underlying, more serious (but unsustained) charge too support a downward variance to time served.

### III.  No Additional Period of Supervision Is Warranted or Necessary

While the misdemeanor sentences cited above typically include a period of either probation or supervised release (and the Probation Department recommends one year of supervised release with no period of home confinement), here such an additional period is unnecessary where (a) Mr. Marrero was under pretrial supervision for nearly two years during

the pendency of this case, and (b) Pretrial Services has recommended that supervision be terminated.

Probation is form of punishment, *see Trotter*, 321 F. Supp. 3d at 345 (citing *United States v. Granderson*, 511 U.S. 39, 50 (1994), and for the reasons set forth above – principally that Mr. Marrero's heroin possession is a function of his addiction – the goals of punishment are ill-served in this case by imposing any additional penalty.[6]

By contrast, supervised release is intended to aid the defendant's reintegration into the community from a carceral setting, something that is unnecessary here. *See id.* at 346. Research has shown that "[n]ot only is there no increase in recidivism rates when low-risk people are not supervised, requiring low-risk people to participate in the treatment and other programs common to post-prison supervision can actually increase the likelihood that they will reoffend." Christine S. Scott-Hayward, *Shadow Sentencing: The Imposition of Federal Supervised Release*, 18 Berkeley J. Crim. L. 180, 217 (2013). While Mr. Marrero will continue to work to battle his addiction, it is hard to imagine that his road to recovery will be smooth. We respectfully submit that the specter of prolonged supervision and revocation is unlikely to increase the chances of success to a degree reflective of the resources that will be expended. Accordingly, given that Mr. Marrero has been on supervision for nearly two years in this matter, and based on the unique facts and circumstances of the case, we respectfully request that the Court not impose a further term of supervision.

---

[6] We note that the simple possession statute imposes a mandatory minimum fine of $1,000, apparently without regard to the defendant's ability to pay. 21 U.S.C. § 844(a). Accordingly, Mr. Marrero will incur this financial penalty for his conviction (a significant expense for him), in addition to the mandatory special assessment.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court sentence Mr. Marrero to time-served with no supervision to follow.  Such a sentence is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Dated: New York, New York
      April 24, 2020

            SHER TREMONTE LLP

            By:  /s/ Michael Tremonte
                Michael Tremonte
                Noam Biale
                90 Broad Street, 23rd Floor
                New York, NY 10004
                (212) 202-2600
                mtremonte@shertremonte.com

                *Attorneys for Reynaldo Marrero*